SAMUEL, Judge.
This suit arises out of a collision between two automobiles. The driver of the plaintiff car, James W. Martin, was killed in the accident and two guest passengers in that vehicle, Wilton P. Trotter and Timothy Lookingbill, were injured. Under the uninsured motorist policy provisions Mr. Martin’s automobile insurer, Government Employees Insurance Company, paid the full policy limits of $5,000 for his death and $1,000 and $2,500, respectively, for the injuries sustained by Lookingbill and Trotter, taking conventional subrogations for those amounts.
Government Employees than instituted this suit against William M. Hebert, the driver of the defendant car, for $8,500 under its subrogations. After trial on the merits, there was judgment dismissing plaintiff’s suit at its costs. Plaintiff has appealed.
The accident occurred at about 5 p. m. on December 19, 1968 in the intersection of Jefferson Highway (La. 48) and Colonial Club Drive in the Parish of Jefferson. The intersection was controlled by the usual traffic lights. Jefferson Highway consisted of two traffic lanes on each side of a neutral ground and Colonial Club Drive was a two-lane street. The defendant car was proceeding easterly in its right or outside lane on Jefferson Highway from the direction of Kenner towards New Orleans. The plaintiff vehicle was on Colonial Club Drive traveling northerly from the river to the lake. The impact occurred in the approximate center of the intersection on the river side of the neutral ground.
There is no dispute over the fact that the plaintiff car had a favorable or green light when it proceeded to cross the intersection. Trotter, the guest passenger in that vehicle who occupied the front seat with the driver, testified the light turned green when they were approximately 150 to 200 feet from the intersection. The driver of another vehicle, Anne B. Davis, who was proceeding on Colonial Club Drive in the opposite direction from the plaintiff car and who, in obedience to' a red light, had been stopped on the opposite or lake side of Jefferson Highway, also testified the light was green for traffic on Colonial Club Drive at the time of the accident.
Defendant admitted he had a red light when he entered the intersection. However, he testified the lights facing him on Jefferson Highway changed from green to red just before he entered the intersection, without the usual intermediate amber signal and without prior warning. He stated the light changed so rapidly he could not even attempt to stop his vehicle, or otherwise avoid the accident, prior to the collision.
The record contains the uncontradicted testimony of more than a dozen witnesses to the effect that for weeks and even months prior to the occurrence of the accident in suit the traffic lights at the intersection frequently had malfunctioned and had been erratic and undependable in that on numerous occasions they had *219 changed quickly from green to red without an intermediate amber signal and on some occasions had been green for traffic on both intersecting streets at the same time, all despite the fact that frequent corrective work had been done on the lights. It was on the basis of this testimony that the trial court concluded the defendant was without liability because of malfunction of the lights facing him.
We agree with the trial court that the record amply establishes frequent malfunctions of the traffic lights controlling the intersection. Nor can we say he erred in accepting defendant’s testimony that the lights facing defendant changed rapidly from green to red without an intermediate amber signal. However, we are concerned with another question not considered by the trial court: whether, under all of the circumstances and after the lights turned red, the defendant could or should have been able to bring his vehicle to a stop in time to avoid the accident.
The testimony of Trooper Richard C. Hoerner, the investigating officer who worked the accident, is in conflict with some of defendant’s testimony. Trooper Hoerner testified in part as follows:
“Q. Did you take note of any skid marks ?
A. Yes sir. I measured the skid marks. I other words, they weren’t passed off, they were measured and it came out on Mr. Hebert’s vehicle 170 feet and 9 inches. That was a one wheel skid.
Q. Where did the skid marks begin in relation to the intersection where did they end?
A. The skid marks began in the right hand land, New Orleans bound, of LA 48 and it veered across the white dividing lines from lane to lane and almost — well it was partially into the left hand lane and the vehicle, you could see was partially into the right hand lane and just about happened dead center into the intersection.
Q. So you would say 170 feet 9 inches to the intersection back down the highway toward Kenner would be the location of the skid marks on the highway?
A. From the point of impact back towards Kenner, that’s correct.”
Moreover, as part of his investigation, Trooper Hoerner also checked the operation of the traffic lights. In that regard he further testified:
“Q. Did you have occasion to check the operation of traffic controls at the intersection ?
A. I did. We watched it that night, of course, because the question had come up about this and we checked the light, you know, while we were conducting the investigation, measuring skid marks and everything and the lights seemed to be in perfect working order as far as we were concerned.”
It is significant to note that Anne B. Davis, the driver proceeding on Colonial Club Drive in the direction opposite from that of the Martin vehicle, also testified in part as follows:
“Q. Which way would you be going if you made the left turn toward what city?
A. Toward New Orleans and, okay, we were stopped at a red light. We were the first car on the right lane, we proceeded when the light was green and I was going to make my left turn but there was a car coming from Colonial Club Drive on the other side, coming toward, you know, where we were going straight across, in other words, so it had the right of way. I had to wait for him to come straight for *220 me to make my left turn so he was coming and then I was looking and there was a red car on Jefferson Highway traveling toward New Orleans and it was — it looked to me, I couldn’t swear to it, that he was going faster than the speed limit. It looked like he was going pretty fast and then I got sort of scared. I was already out in the highway. I backed up a little bit and when he did he hit this green car, a new looking car. And he hit him on the driver’s side from what I could tell.”
Thus, we cannot accept defendant’s statement that the lights facing him on Jefferson Highway abruptly changed while he was in very close proximity to them. We can conceive of no reason for the existence of 170 feet 9 inches of skid marks made by his car to the point of impact other than that he saw the lights turn to red at some point before the 170 feet 9 inches distance and then applied his brakes in an attempt to stop his vehicle.
When the lights changed to green for traffic on Colonial Club Drive, Miss Davis started her vehicle forward, crossed the outbound lanes of Jefferson Highway, stopped partially in the center-neutral ground area to allow the oncoming plaintiff vehicle to proceed before she made her left turn, noticed the approaching defendant car, became frightened that she would be struck, and backed her car to prevent involvement in an accident. Thereafter the accident did occur. These maneuvers on the part of Miss Davis had to consume a considerable amount of time.
According to his testimony, the defendant lived in the vicinity and used the intersection about three times a week. In addition, the testimony relative to the malfunctioning of the lights was given principally by witnesses who were his friends and neighbors. Although he denied such knowledge, it appears to us he must have known of the malfunctioning prior to the accident and therefore should have approached the intersection with much more than the usual caution. The sight of Miss Davis’ car crossing on Colonial Club Drive in his clear view should have warned him the lights probably were green for that street. Even assuming the lights facing the defendant did not flash an intermediate amber signal, we are convinced they were red in sufficient time so that he could and should have been able to stop and avoid the collision had he been traveling at a proper speed and exercising due care and diligence under all of the circumstances.[1]
We note there is no issue regarding quantum.
For the reasons assigned, the judgment appealed from is reversed and it is now ordered that there be judgment in favor of the plaintiff-appellant, Government Employees Insurance Company, and against the defendant-appellee, William M. Hebert, in the full sum of $8,500, together with legal interest thereon from date of judicial demand itntil paid; all costs in both courts to be paid by the defendant-appellee, William M. Hebert.
Reversed.

. See Costanza v. Barker, La.App., 255 So.2d 255; McCain v. State Farm Mutual Automobile Ins. Co., La.App., 236 So.2d 922; Scruggs v. McCraney, La.App., 234 So.2d 262; Folse v. United States Casualty Company, La.App., 87 So.2d 349.